Mr. Justice STRONG-
 

 stated the admitted facts, the evidence on the disputed ones, and delivered the opinion of the court.
 

 The substantial facts, as they are made to appear by the evidence, are these: On the morning of the 28th of April, 1868, the schooner, a vessel of sixty-nine tons burden, laden with one hundred tons of pig-iron, was proceeding down the Chesapeake Bay from Baltimore, toward the capes, on her voyage to Providence, Rhode Island. The wind was fair, blowing from the northeast, and the course of the schooner was south by east one-half east. Her speed was about seven knots an hour. She was in good condition, and her lights were displayed as required by law.
 

 At the same time the steamer Fannie, on her voyage from Savannah to Baltimore, was' proceeding up the bay at a speed of about nine knots an hour, her general course being north by west. The two vessels were thus approaching each other on nearly parallel lines, with a difference of half a point in their courses. The steamer’s lights were all in their proper places, and fully displayed. About opposite
 
 *240
 
 Point Lookout, where the bay is twelve miles wide, and where there are six miles in width • of clear deep water, nearly in the middle of the bay, the vessels encountered each other head- on, the bow of the steamer striking the bows of the schooner. The effect of the collision was to break in the*b'ow of the schooner and cause her to sink in from five to ten minutes. The steamer passed on without stopping or slackening her speed, or offering assistance, but continued on her course to Baltimore, where she made no report of the’encounter.
 

 From this statement of the leading facts, none of which are controverted, it is very obvious there can be no excuse for the collision. There was ample sea-room for the movement of both vessels, the lights of both were well displayed, and there was no fog or stress of weather. Plainly, one or both of the vessels was grievously in fault. The District Court, after considering the evidence, held that the fault was chargeable to the steamer alone, and condemned her to pay to the owners of the schooner $10,365, and the Circuit Court on appeal made a similar decree.
 

 In this court there has been no controversy respecting the law applicable to the case. The efforts of the appellants have been directed almost exclusively to an elaborate criticism of the evidence, in the hope of convincing us that both the District and Circuit Courts were mistaken, and that the schooner was in fault. We are not, however, thus convinced.
 

 The duties of vessels approaching each other, as these vessels were, are too well defined to need more than a simple statement. The steamer was bound to keep out of the way of the schooner, and to allow her a free and unobstructed passage. Whatever was necessary for this, it was her duty to do, and whatever obstructed or endangered the schooner in her course it was the duty of the steamer to avoid. There was but a single obligation resting on the schooner. It was passive rather than active, the duty to keep on her course. If, therefore, the schooner did not change her course, so as
 
 *241
 
 to embarrass the steamer and render it impossible, or at least difficult, for her to avoid a collision, there can be no doubt that the steamer alone is answerable for the damages. In reference to this we have carefully examined the evidence. It is to be found in the testimony of the mate and a seaman of the Ellen Forrester, who composed the watch at the time of the collision, and in the testimony of the mate and two seamen of the steamer. Both the mate and the wheelsman of the schooner state positively that there was no change in her course from the time the captain left the deck (twelve o’clock) until the collision took place. When the watch of the mate commenced, the course of the-vessel was south by east one-half east. The-witnesses on. both sides agree that this was the right course to pursue in sailing down the bay. Bryant, the man at the wheel, was. in a position to know whether the course was changed, and' he could not be mistaken. It is not to be presumed that he-changed the coui’se of the vessel without orders. And the-mate must know whether he gave any orders to port or starboard the wheel. The testimony of these witnesses,, therefore, is not a mere statement of an inference drawn, from appearances. It is direct and positive, and both of them state that the course of the schooner continued unchanged from the time the captain left the deck. In addition to this is the improbability of any change. The course south by east one-half east was the right course to be pursued in passing down the bay and out of the capes. Any deviation from it would have retarded the voyage. Either luffing into the wind, or falling off, would have been a departure from the proper course. And there was nothing to-induce it. The wind was fair, and the schooner was nearly midway in the bay, with abundant sea-room on each quarter-There was no motive for a change of course, therefore, but every reason for holding on.
 

 In opposition to this we have the testimony of Billups, the mate, and two seamen of the steamer. They infer from their observation of the schooner’s lights that she changed her course twice, first luffing into the wind, and then im
 
 *242
 
 mediately bearing away to the westward. At best this is not the most satisfactory evidence, for it is liable to double mistake; mistake of the facts, and mistake of the inferences deduced from the facts. Thus it was said in the case of the steamboat
 
 Neptune:
 

 *
 

 “What a witness asserts he did, or did not do, on his own vessel at the time, is generally more satisfactory evidence of the facts than the opinion and belief of a dozen others formed from what they supposed they saw or heard on another vessel.” But the testimony is subject to more serious objections. It is confused, contradictory, and inherently improbable. Some of it wears the appearance of being uncandid. The schooner’s lights were seen from the steamer when the vessels were three or four miles apart, apparently one point off the steamer’s port bow. Billups, the steamer’s mate, states that he saw the red light. He leaves it to be inferred that he saw the red light only. Yet if the vessels were sailing on the courses which it is not denied they were at the time, with only a half-point difference between them, the green light of the schooner must have been as plainly visible to those on the steamer as was her red light. Billups says, that a few seconds afterwards he ordered the helm a-port. But the man at the wheel testifies that the vessels were pretty close together when the order to port was given, and that,' after porting, the steamer hardly ran fifty yards before an order was given to starboard, followed by a second order to port, before the steamer had run to port twenty yards. The collision then immediately followed. In these particulars the testimony of the look-out on the steamer is substantially the same. Comparing it with the account these witnesses give of the movements of the schooner, the unreliability of their impressions becomes manifest. It is clear that the first order to port, if given at all, was not given until the vessels were close together. The course of the steamer, after she passed the light-boat off Smith’s Point, was north by west. That carried her across the course of the schooner, which was, as we have seen, south
 
 *243
 
 by east one-half east, and that accounts for the appearance of the schooner’s green light, and for the impression of the mate that she was sailing across the bow of the steamer, having changed her course. It must have been then that the order to port was given, followed almost immediately by au order to starboard, and a second order to port. All this is perfectly consistent with the testimony of the witnesses for the appellees that there was no change in the course of the schooner. The account given by the appellant’s witnesses is very improbable. They say the schooner luffed across the steamer’s bow, and sailed on her changed course not more than fifty yards before she fell off again to the westward. Billups swears that when she thus headed across the steamer’s bow she was “some feet” distant, or, as he afterwards defined, from seventy-five to a hundred feet. It was after this he ordered the helm to starboard and to port, lie did not slacken the speed of the steamer, or order the engine reversed. The changes described by him in the coui’se of the vessels could not have been made in such rapid succession as is stated by the appellant’s witnesses. The schooner could not have luffed up into the wind, sailed fifty yards on her new course, and then borne away to the westward, while the steamer with unslacked speed was moving seventy-five or a hundred feet. No wonder, therefore, both the courts below held the steamer solely in fault. The' evidence was wholly insufficient to justify the belief that the schooner did not keep on her course as the rules of navigation required.
 

 We do not think it worth while to discuss the question whether the look-out on the schooner was sufficient. If it was not, it can make no difference, for the want of a proper look-out did not contribute to the disaster. If the schooner held her course, it was all that the steamer had a right to require,-and, whether she had a proper look-out or not, it was her duty to do precisely what she did.
 

 Decree affirmed.
 

 *
 

 Olcott, 495.