HENRY LORD *et als. vs.* WILLIAM B. HAZELTINE *et als.*

Penobscot.   Decided June 5, 1877.

*Shipping.*

United States statute rules for avoiding collisions between steamships and sailing vessels applied.

If two vessels, one of which is a sail-vessel and the other a steam-vessel, are proceeding in such directions as to involve risk of collision, the steam-vessel shall keep out of the way of the sail-vessel.

Every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.

When by the rules one of two vessels shall keep out of the way, the other shall keep her course.

The common law rule of contributory negligence applied to an action for collision between vessels.

If the collision is the fault of the plaintiff or of both parties or of neither, the plaintiff cannot recover.  If it happens by the fault of the defendant and without any contributory fault of the plaintiff, he can recover, provided he sustains the burden of proof which the law imposes on him.

ON MOTIONS.

CASE by the owners of the schooner Bloomfield against the owners of the steamer Cambridge to recover damages for loss of the schooner by collision with the steamer July 2, 1874, on the Penobscot river.

The evidence on the part of the plaintiffs, coming from those in the schooner and those who saw the collision from the shore, was that the schooner kept her course, as by the rule she should. The evidence on the part of defendants, coming from officers and passengers on the steamer, was that as the steamer changed her course to avoid the collision, the schooner changed hers the same way and thus the collision.   The steamer ran squarely over the schooner, breaking her in two.

The verdict was for the plaintiffs for $1,612.50, which the defendants moved to set aside as against law and evidence.   They also filed a motion for a new trial on the ground of newly discovered evidence from other witnesses, passengers, who saw the collision from the steamer.

*C. P. Stetson,* for the plaintiffs.

*F. A. Wilson & C. F. Woodard,* for the defendants.

VIRGIN, J.  The rules of navigation prescribe the conduct of vessels towards each other while traversing the natural highway of ocean and river.  They are founded in common sense and experience.  They were established for the general security of commerce, for the prevention of collisions and the consequent protection of life and property, and for the ascertainment of the rights of parties when collisions occur through the violation of rules applicable thereto.  The general principle is that when collision may result from the continued directions of two vessels, that one which can the more readily vary her course, is bound to do so.  Hence one sailing before the wind or with a fair wind, must for the reason mentioned, give way to another close hauled to the wind.  And a steamboat, which can be moved at will in any direction—forward, backward, or stopped altogether—having her movements more under immediate control than any sailing vessel, which can go only when and where the winds and currents permit, always has the power to avoid collision when managed with ordinary skill and prudence.  These rules have become settled by repeated adjudication and they are now embodied in the statutes of the United States.  Those applicable to the case at bar are as follows: "If two vessels, one of which is a sail-vessel and the other a steam-vessel, are proceeding in such directions as to involve risk of collision, the steam-vessel shall keep out of the way of the sail-vessel.

"Every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.

"When by rules 17, 19, 20 and 22 one of two vessels shall keep out of the way, the other shall keep her course," &c.  R. S. of U. S., c. 5, § 4233.

The rules of admiralty on the subject of collision do not concur in all respects with those of the common law.  This being an action at common law, tried by a jury, the presiding justice properly instructed them, in substance, that if the collision were the fault of the plaintiff, or of both parties, or of neither, the plaintiff could not recover.  If it happened by the fault of the defendants and without any contributory fault of the plaintiff, then he could

recover, provided he had sustained the burden of proof which the law imposed on him.

We now pass to a consideration of the motions.

The western bank of that reach in the Penobscot river extending from "Pulpit Rock" down to and including "Stubb's Point," is very high, the Point rising more than one hundred feet above the water. Between the Rock and the Point the course of the river is S. E. by E.; and when the Point is turned the river flows due south. In this lower reach some two to three thousand feet below the Point and about three hundred feet from the eastern shore, is "Buck's Ledge," between which and the western shore is the channel about seven hundred feet in width.

At about noon on July 2, 1874, near high water, with a flood tide and a six knot breeze "south a little easterly," the plaintiffs' schooner, Bloomfield, of forty-five tons, with no cargo on board, manned by a master, one able bodied seaman and a boy of sixteen years, was sailing up the lower reach under a mainsail, foresail and gaff-topsail on the port side, and a jib, with the captain at the wheel and the seaman near him on the port side of the wheel. At the same time, defendants' steamer "Cambridge," of about thirteen hundred tons, on her regular trip from Bangor to Boston, with the captain, one helmsman and a passenger in the wheelhouse, was steaming down the upper reach, at her usual speed of twelve knots. She rounded the Point with helm hard to port and in attempting to pass the Bloomfield on the latter's port side struck her on her starboard quarter, a little aft of her fore rigging, cut her in two and passed between the severed portions some distance.

The plaintiffs contended before the jury that they were in no fault; but that the collision was caused by the negligence of the defendants' servants, in that both pilots were off duty at the time, taking their dinner, that the speed of the steamer was not slackened, that she neither stopped nor reversed; and that there was not room enough for the steamer to pass, as she attempted to, between the schooner and the western shore, but that she should have passed on the other side where the channel was open and free. On the other hand, the defendants contended that as soon

as they had cleared the point sufficiently to discover the schooner, they instantly gave the whistle signal of danger and stopped her engines; that the steamer was rightfully swinging westerly with her helm aport for the purpose of turning the point and to pass on the schooner's port quarter, between which and the western shore there was ample room; and that they would have safely done so, had not the schooner, after the steamer had resolved upon her course, jibed her sails, changed her course, headed towards the western shore and thus caused the collision. The plaintiffs absolutely denied any change of course on the part of the schooner; but on the contrary contended that their master well knew and strictly observed and adhered to the rules of navigation, denying, as did also the defendants, the existence of any special circumstances which called for any departure from the general rules.

This question of fact was the principal and most important one in controversy, and was distinctly submitted to the jury. The rules of law applicable to the case were lucidly, fully and forcibly explained. If the jury followed the law of the charge, (and we perceive no reason for believing otherwise), they must have found the issue for the plaintiffs. We are now asked to set aside the verdict based on such finding, on the ground that it is against the weight of evidence, and on the ground of newly discovered evidence reported.

But after a very careful examination and consideration of the evidence reported, we do not feel at liberty to disturb the verdict. The evidence is in dire conflict, and the witnesses on each side quite numerous. The two vessels were approaching each other in opposite directions, and were, therefore, "proceeding in such direction as to involve risk of collision," and it was the steamer's bounden duty, under the rules of navigation, "to keep out of the way of the sail-vessel," "slacken her speed, or, if necessary, stop and reverse." She did not keep out of the way of the Bloomfield, but collided with her ; and she is therefore *prima facie* at fault. *The Carroll*, 8 Wall. 302. Neither did she stop and reverse, although it would now seem that the collision might possibly have been avoided by such action. The captain of the steamer,

the helmsman and passenger in the pilot-house, two witnesses standing on the upper deck, two others in the extreme bow, and three others on the main deck near the pilot-house, most of whom possessed more or less nautical experience, and having a clear and unobstructed view of the schooner from the moment she was uncovered, testified that she changed her course after the steamer had chosen hers with reference to the schooner's.

On the other hand, the crew of the schooner, having full and absolute knowledge of the real fact, assert positively and unequivocally that she kept her course, and that her sails did not jibe, although the wind being so nearly dead aft, the mainsail may have taken the wind from the foresail so that it did not fill and the fore-boom may have swung in. Seven other witnesses at various places on the eastern shore, residents in the vicinity of the occurrence, some with more or less nautical experience, and all frequent observers of the passing and repassing of vessels there, testified,—some positively that the schooner did not change her course, and others that with their attention directed to the vessels approaching each other, they observed no change. But notwithstanding the defendants' opposing testimony and the negative character of some portion of the plaintiffs', the jury, upon a full consideration of the whole evidence, were convinced that the plaintiffs had sustained the burden imposed upon them. They seemed to be of opinion that (as was said in the case of the *Neptune*, quoted approvingly in *The Fannie*, 11 Wall. 238, 242), "What a witness asserts he did, or did not do, on his own vessel at the time, is generally more satisfactory evidence of the facts than the opinion and belief of a dozen others formed from what they supposed they saw or heard on another vessel;" and that the landsmen standing still and having fixed points · of observation, were not subject to any illusion as to the movement of the vessels; while those on the steamer might, as the cross-examination of some of them shows they evidently did unconsciously and unwittingly impute the steamer's change of course to the schooner. If the schooner, as many testified, was nearer the western shore than Buck's Ledge, sailing north so as to clear Stubb's Point, her port side would be first seen by those on the bow of the steamer; and

when the latter was farthest west from the Point in turning it, she would have crossed the schooner's course and the latter's starboard quarter would be seen. To an inexperienced person, at least, standing upon the bow of the steamer, and unconscious of his own motion, these appearances might naturally indicate a change of the schooner's course to the westward.

The alleged declarations of the captain and one of the crew of the schooner are substantially denied by them.

If the schooner kept her course, it was all the steamer had a right to require; and whether she had a proper lookout or not becomes entirely immaterial. If she had, or had not, a sufficient lookout, she did precisely what her duty required. *The Fannie, sup.*

The newly discovered evidence comes from three residents in Bangor who were on the steamer at the time of the collision, which fact the books of the defendants contained, and proper diligence would have secured their attendance as witnesses at the trial. Their testimony is simply cumulative upon the main issue. One of them (Pond) testified, on cross-examination, "The collision took place as we rounded Stubb's Point—just below it. I don't think the bow of the steamer swung around before the collision. I did not notice any swinging of her bow. Sails of the vessel changed two or three points so that they fluttered. . . I saw no change in steamer." The two others testified, substantially, the same. Such evidence could not have changed the result.

*Motions overruled.*

APPLETON, C. J., WALTON, BARROWS and DANFORTH, JJ., concurred.