## THE HAVANA.

### THE MARY ADELAIDE RANDALL.

WIERK et al. v. THE MARY ADELAIDE RANDALL.

RANDALL et al. v. WIERK et al.

(District Court, D. Connecticut. March 8, 1893.)

No. 907.

1. COLLISION—RIGHT OF WAY—CHANGE OF COURSE—LOOKOUT.
   If a schooner, having the right of way, held her course, it is all an approaching steamer had a right to require, and whether she had a proper lookout or not is immaterial. The Fannie, 11 Wall. 243, followed.
2. SAME—WEIGHT OF EVIDENCE.
   The rule is that the testimony of officers and witnesses as to what was actually done on board their own vessel is entitled to greater weight than that of witnesses on other boats, who judge or form opinions merely from observation. The Hope, 4 Fed. Rep. 89, followed.
3. SAME—STEAM AND SAIL—DUTY TO STOP AND REVERSE.
   Where a steamer and a schooner are half a mile apart, and the master of the steamer sees there is danger of collision, it is his duty to slacken her speed, or stop and reverse, if necessary.
4. SAME—ERROR IN EXTREMIS.
   Where a vessel, by her own negligence, or the breach of a statutory rule, places another in great peril, the latter will not be held guilty of negligence because at the last minute she did something that contributed to the collision, or omitted to do something that might have avoided it.

In Admiralty. Cross suits for damages by collision.

H. D. Hotchkiss, for libelants.
Samuel Park, for claimants.

TOWNSEND, District Judge. These are cross libels for damages caused by a collision. There is no disputed question of law. There is the usual conflict of testimony as to the material questions of fact. It is agreed that the collision occurred in the lower bay of New York, in the main channel, between Swinburn island and the bell buoy at the head of the swash channel; that the four-masted schooner Randall struck the fishing steamer Havana; that the time of the collision was December 21, 1891, about half past 3 in the afternoon; that the day was clear; that the wind was blowing about 40 miles an hour from the northwest; and that there was a strong ebb tide. When the vessels were about three miles apart, the Havana was coming up the bay, and was close to the bell buoy, and the Randall was going down the bay, was about in the center of the channel, and abreast of Swinburn island, and was headed S. by W. There were no vessels or shoals to interfere at any time with the free movement of either vessel.

The claim of the libelants, the owners of the steamer Havana, is as follows: When the vessels were three miles apart, they were virtually coming head on; the course of the steamer being N. by E. The courses of the vessels remained unchanged until they got within about a mile of each other, when the steamer, having reached

buoy No. 10, hauled to the eastward about a point or a point and a quarter, or to a course of N. N. E. ½ E., so as to go to the leeward of the schooner. The steamer had only gone on this course for a few seconds when the schooner also commenced to change her course, and swung off to the eastward, taking a course about S. E., so that nearly all of her starboard side was visible. Thereupon the captain of the steamer starboarded his wheel until she came around to a course about N. by W., and her bow cleared the line of the schooner. The schooner then again began to change her course, and luffed from S. E. to the westward; the vessels then being about half or three quarters of a mile apart. The steamer again starboarded her wheel, and blew two whistles to signify that she was going to port; but the schooner continued to luff, in spite of the alarm signals from the steamer, and, when heading about W. by S., struck the steamer, which was heading about W. or W. by N., aft the paddle box.

The claim of the cross libelants is as follows: The schooner was sailing over the land at the rate of 14 or 15 knots, and through the water at the rate of 10 or 11 knots. The course of the steamer was about N. N. W., and she did not change her course to N. N. E. The schooner kept straight on her course, S. by W. down the channel, and did not change it to S. E., or in any other way, until it became evident that a collision was inevitable, when, the vessels being 500 to 800 feet apart, the schooner's wheel was put hard down, bringing her into the wind until she headed W. ½ N., minimizing the blow, and avoiding more serious results.

Each of these theories is supported by the evidence of several witnesses, some of them on each side, being apparently disinterested and competent. For the purpose of determining the questions involved, I have divided the inquiry into two parts: First, as to the original alleged changes of course towards the eastward; second, as to the conduct of the respective vessels just prior to the collision.

I assume that the burden of proof is on the steamer to show that the schooner, having the right of way, changed her course towards the eastward to get out of the way of the steamer. It is agreed that when abreast of Swinburn island the course of the schooner was S. by E. Her master, first officer, second officer, steward, lookout, and Wersebe, a passenger on board the steamer, all deny that she changed her course towards the eastward. The manager, pilot, and captain of the steamer testify that the schooner did so change her course. Their testimony is supported by that of Canning, an experienced navigator, a passenger on board the steamer. Dexter, a Sandy Hook pilot, testifies that he was on board of a steamer about a mile and a half away, and saw the schooner on the steamer's starboard bow, luffing very fast towards the steamer until she struck it. It is claimed that the vessels could not have been in the positions alleged by the witness unless the schooner had previously shifted her course to the eastward. The other witnesses fortify their statements in support of the schooner's alleged change of course by the claim that they noticed that she swung off until her head sails were becalmed.

It is further shown that the witness Peterson, the only seaman who is shown to have been on the forward deck of the schooner, was ignorant and incompetent. It does not appear that he understood he was expected to act, or did act, as lookout. But inasmuch as all hands, nine in number, were on the deck of the schooner, and the captain and first and second officers saw the steamer when she was from a mile and a half to three miles off, and the captain gave particular attention to her course from the time she was a full mile away, and, fearing the danger of a collision, gave orders to keep on a straight course, I think the want of a more experienced lookout is immaterial, and did not contribute to the collision. "If the schooner held her course, it was all that the steamer had a right to require, and, whether she had a proper lookout or not, it was her duty to do precisely what she did." Mr. Justice Strong in The Fannie, 11 Wall. 243. Upon the question of probabilities, the counsel for the steamer call attention to the claim of the witnesses for libelants that the tendency of their schooner was to eat to the windward, and to the fact that the helmsman, Schmidt, was not called as a witness, and argue that she had probably got so far out of her course towards the westward that the helmsman changed her course to southeast in order to bring her back into the middle of the channel.

Counsel for libelants further attempt to show, by mathematical demonstration, that the captain of the schooner was mistaken in his statement of the course and location of the steamer when first sighted by him. I have tried to give to the evidence in support of these claims its proper weight, in a consideration of the whole question, but it has failed to satisfy me that there was any such change of course, for the following reasons:

1. The officers and men on the schooner deny any such change of course. "The established rule is that the testimony of officers and witnesses as to what was actually done on board their own vessel is entitled to greater weight than that of witnesses on other boats, who judge or form opinions merely from observation. The Hope, 4 Fed. Rep. 89; The Erastus Wiman, 20 Fed. Rep. 248, 249; The Alberta, 23 Fed. Rep. 807," etc. The Alexander Folsom, 52 Fed. Rep. 411, 3 C. C. A. 165. I have not overlooked the fact that the helmsman was not called on this point, but I do not regard this fact as so important, inasmuch as it appeared that the first officer was stationed with him at the wheel. Furthermore, the significance which might otherwise be given to his absence is diminished by the explanation that, although the collision occurred on December 21, 1891, the libel was not filed until February 22, 1892, and the helmsman was discharged about a month after the collision, and before any claim had been made for damages.

2. The witnesses on both sides agree that the course of the schooner was S. by W. when the vessels were three miles apart, and so continued until she was within a mile of the steamer. They also agree that this was the proper course to pursue in sailing down the bay. No reason, except the possible change by the helmsman to get back into the channel, which was not proved, is suggested

why the schooner should have changed her course. The captain of the steamer admits that he cannot assign any reason for the change, unless it was to cross the bow of his steamer to avoid her, and that he cannot understand what occasion there was for that. He admits that he did not think she was going out through the east channel, and that the natural course of the schooner was S. by W. down the main channel, where there was plenty of water, and no danger of collision.

3. There is a serious conflict of testimony between the witnesses for the libelants as to the respective positions of the vessels when they were first sighted. Canning and Schrader, two witnesses for libelants, contradict the master and pilot, their two other witnesses. This conflict, and the necessary uncertainty as to the location of the two vessels during the time they were approaching each other, deprive the mathematical demonstrations by counsel for libelants of much of the value which they might otherwise have in supporting the claim of libelants.

4. There is another circumstance to be considered. Up to the day of the collision, a log of each cruise had always been kept on the steamer by the pilot, but, although the pilot remained on the steamer for some days after the collision, the log for that cruise was not written up.

5. In support of the claim of cross libelants, it was shown by the testimony of the captain of the steamer that she was about 30 years old, and that the water was smooth, and the current less strong, on the west bank of the swash channel than in the middle. From this it was argued that with the wind blowing southwest at the rate of 40 miles an hour, and a strong ebb tide, the steamer would naturally steer a west course in order to avoid the current.

6. It was further argued that as the schooner was light, with the wind on her quarter, she necessarily yawed more or less in attempting to hold her course, and that this yawing was what led the captain of the steamer to think that, for a few seconds, she changed her course to the eastward.

7. The testimony of the captain of the steamer, especially as to her speed on the day of the collision, was not altogether satisfactory. He seemed to have overlooked or miscalculated the effect of the strong head wind and tide.

8. Counsel for the cross libelants argue with much force that by reason of this miscalculation, having shaped his course across the main channel, leaving, as he supposed, ample room for the schooner to cross his stern, she, sailing swiftly, was close upon him before he realized his danger, and that when he whistled, and put his wheel to starboard, it was too late to avoid the collision.

9. The claim of the libelants, that when the vessels were three miles apart the steamer changed her course from N. by E. to N. N. E. ½ E. a few seconds before the alleged change of course of the schooner from S. by W. to S. E., is not supported by the evidence. Out of 11 witnesses examined on this point, only 2, the captain and pilot of the steamer, swear positively and satisfactorily to this change. Schrader, the manager of the steamer, admits he did not

take notice, and cannot tell, although he was at the wheel. He says the first change he noticed in the course was when the captain put the wheel to starboard; that is, to make the other change to westward. Furthermore, he contradicts the testimony of the pilot and captain of the steamer by locating the schooner as being on the steamer's starboard bow, and in this statement he is corroborated by Canning, the other witness for the libelants on the steamer. Canning further testifies to but one change of course on the part of the steamer, namely, to the westward. Wersebe and Haur, two disinterested witnesses on the steamer, swear that, during all the time they saw the schooner, she was on the starboard side of the steamer.

For these reasons. after careful consideration of the testimony, the appearance of the witnesses, and the comparative probabilities of the case, I have reached the conclusion that the steamer did not change her course to the eastward, and that the schooner kept on her course of S. by W., and did not go to the eastward.

The captain of the steamer testified that, when the vessels were from a half to three quarters of a mile apart, he commenced to starboard his wheel, and to bring the steamer around to the westward, and that about the time he made this change the schooner commenced to luff to the westward. He says he then thought there was danger of a collision, but he still kept going as fast as he could towards the westward. while the schooner continued to luff in the same direction. If this testimony is true, the duty of the master was clear. "Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse, if necessary." International Regulations, 23 St. at Large, March 3, 1885, c. 354, art. 18. See, also, The Adriatic, 107 U. S. 515, 2 Sup, Ct. Rep. 355. "The two vessels were still a half a mile apart. * * * He should have waited a moment, * * * or, if the peril was impending, and the danger too immediate to justify any delay on the occasion, then he should have slackened his speed, or, if necessary, stopped and reversed, as required by the sixteenth sailing rule." The Sea Gull, 23 Wall. 177; The Excelsior, 38 Fed. Rep. 271.

The situation of affairs just prior to the collision was as follows: The two vessels had drawn steadily together, end on, the schooner yawing somewhat with a following wind; the steamer forcing her way against a 40-mile wind and a strong ebb tide. Almost before they realized their peril, they were so close that a collision seemed inevitable. The schooner commenced to luff to the westward. The captain of the steamer put his helm hard to starboard, and immediately blew two whistles, indicating that he would go to port, following it almost instantly by three danger whistles. The steamer brought her head to W. N. W. The schooner luffed into the wind till she was headed about west, and, running under diminished headway, struck the after part of the paddle box of the steamer.

It is claimed that the schooner changed her course to the westward after the steamer had changed her course to the westward to get out of the way of the schooner, and that, if the schooner had held her course, no collision would have occurred. Such a claim can

only be supported upon the theory of a deliberate attempt on the part of the schooner to run the steamer down, or of a supposed imminent danger of collision, calling for such change of course. Whether the collision would or would not have occurred if the schooner had held her course, it is impossible to determine. I find that the captain of the schooner, placed in extreme peril by the failure of the steamer either to steer out of the way of the schooner, or to back and stop, believed that if he kept his course he would sink the steamer, or cut her in two. The steamer was loaded with passengers returning from a fishing excursion. He could not afford to run any risk, or to speculate as to how far or how fast she might go to starboard. He had no right to hold his course, if to do so would cause a collision. He was bound to use his best judgment, and, if he made a mistake, it was made in extremis, and was not a fault. The soundness of the judgment of the captain of the schooner is supported by the fact that the injuries to the steamer were so slight as to enable her, without stopping, to return to New York at her usual rate of speed.

As is said by Judge Wallace in The E. A. Packer, 49 Fed. Rep. 98:

"I understand the rule to be well established that in every case where a vessel, by her own negligence, or the breach of a statutory rule, places another in great peril, the latter will not be held guilty of negligence because at the last moment she did something that contributed to the collision, or omitted to do something that might have avoided it. It has often been held by the supreme court that a vessel which by her own fault causes a sudden peril to another cannot impute to the other, as a fault, a measure taken in extremis, although it was a wrong step, and but for it the collision would not have occurred, and that a mistake made in the agony of the collision is regarded as an error for which the vessel causing the peril is altogether responsible."

See, also, The Schmidt v. The Reading, 43 Fed. Rep. 816; The Eliza S. Potter, 31 Fed. Rep. 687, 35 Fed. Rep. 220.

The claims of the libelants that when the schooner was a half to three quarters of a mile away, she commenced to luff towards the steamer, and that if the steamer had then stopped the schooner would have cut her in two, are unsupported by the preponderance of testimony, and are contrary to all the probabilities of the case, as gathered from the surrounding facts.

For the reasons stated I find that the schooner Randall was not in fault, but that the steamer Havana was in fault, and that such fault was the cause of the collision.

Let a decree be entered accordingly.