### THE FANNIE HAYDEN.

#### (District Court, D. Maine. May 2, 1905.)

#### No. 33.

1. COLLISION—SCHOONERS CROSSING AT NIGHT—FAILURE TO KEEP LOOKOUT.

Where the only two men on the deck of a schooner navigating in the night were engaged in taking down sail, neither one nor both constituted a proper lookout, and she is in fault for a collision with another schooner having the right of way, and which should have been seen from a quarter to half a mile distant, but was not seen until immediately before the collision.

2. SAME—CONTRIBUTING FAULT.

When the privileged one of two schooners kept her course until collision, as she was bound to do, it is not material to inquire whether or not there was any incompetency on the part of her lookout, since, if so, it was not a fault which contributed to the collision.

In Admiralty. Suit for collision.

George E. Bird and William M. Bradley, for libelants.
Benjamin Thompson, for claimant.

HALE, District Judge. On the 18th day of January, 1904, between 4 and 5 o'clock in the morning, at a point to the southward and westward of outer Green Island, in Casco Bay, the libelant's schooner Lettie May was sunk through a collision with the schooner Fannie Hayden. This libel is filed to recover for the damages to the Lettie May and for the loss of her outfits and catch on board, and also for the loss of the personal effects of her crew.

The Lettie May was a two-masted schooner of the burden of about 27 tons, 50 feet long, 16 feet beam, and 9 feet draft, and at the time of the collision was engaged in fishing. About 3 o'clock in the morning of the day of the collision she got under way at Coleman's Cove, Chebeague Island, for the fishing grounds. She had on board a crew of eight men all told. The weather was clear, the wind about a five or six knot breeze, blowing about north. Her mainsail, foresail, forestay sail, and jib were set. The side lights were lighted and in place. After leaving Chebeague Island she proceeded southwesterly about a mile, until she was off the western end of Hope Island, when she was on a course about south-south-

west. She continued upon that course until she was off the southern and western end of the Green Islands, when her course was changed to about south. She ran about a mile or a mile and a half on that course, when the master, Capt. Dyer, concluded that, as the wind was unfavorable, he would have her hove to until it moderated. She was accordingly hove to on the starboard tack, the outer jib was hauled down, the fore sheet was trimmed flat, the main sheet was slacked about two feet, the jumbo was hauled to windward, and the wheel was put hard down. The schooner was then lying within three or four points of the wind, and was making about a northwest course. The wind was about north. The captain was standing in the companionway. William Ross was the only person on deck from the time the schooner left Hope Island until about five minutes before the collision, when Walter Calder relieved Ross, and Ross went below. Calder remained on deck until the collision occurred. He did not see the Fannie Hayden approaching, and did not know of her approach until the two schooners came together.

The Fannie Hayden is a two-masted schooner of the burden of about 20 tons. She is 58 feet long, 19 feet beam, and of about 9 feet draft. At the time of the collision she was in use as a pilot boat by the pilots of the English steamers entering the port of Portland. She left Portland about 3 o'clock in the morning on the day of the collision, with four men on board, for the purpose of going to the pilot grounds in the vicinity of Half Way Rock, to meet an English steamship then due in port. Capt. McVane, a licensed pilot, having charge of the bringing in of English steamers, was in command. After leaving her berth, the Fannie Hayden proceeded out through the ship channel under a two-reef mainsail, a whole foresail, and jumbo, but she did not have her jib set. She continued in this way until a short time before the collision, the time being estimated by the captain to have been about five minutes before the collision, when the jumbo was hauled down, the fore sheet was hauled aft, and the main sheet lifted about four points. Natvig, one of the crew, who had been on the lookout, came aft about two minutes before the collision, and went into the cabin to rake the stove. Capt. McVane continued in charge of the vessel, walking quickly back and forth in front of the wheel, within a quarter of a minute each side, and walking about six feet each way, according to his testimony, looking first to one side and then to the other. The first knowledge he had that he was approaching the Lettie May was when she appeared about half her length ahead. He started to heave the wheel up, and when she struck he says he ran forward as far as the gangway and hollered, and then ran aft and hove the wheel clear up. The Fannie Hayden struck the Lettie May on the port side between the fore and main rigging, cutting into her. The Lettie May shortly after sank. Her crew were brought into Portland by the Fannie Hayden.

At the time of the collision the wind was north. The night was clear and cold. The Lettie May was on the starboard tack, lying within three or four points of the wind, making very little headway.

She had the right of way. The Fannie Hayden was on the port tack, making about five knots. The evidence is somewhat contradictory as to how far the sails of a vessel could be seen on that night, but the testimony of disinterested witnesses leads me to believe that such sails could be seen from a quarter to a half mile. The weight of the evidence compels the conclusion that for at least five minutes before the collision there had been no proper lookout on the Fannie Hayden, and that, if there had been such lookout, he must have seen the Lettie May, and avoided the collision. The master of the St. Paul, a schooner sailing near by, saw the Lettie May after she was hove to. At the precise time of the collision there was no one on deck except McVane, the captain and wheelsman. For at least five minutes before the collision the captain and Natvig had been engaged in taking down the jumbo and making it fast; and after that, and at least two minutes before the schooners came together, Natvig went aft into the cabin to rake the stove. When the only two men on deck are engaged in taking down sail, in the nighttime, neither one of them nor both can, in my opinion, constitute a proper watch. A seaman whose duty is to watch, but who goes aft into the cabin to rake the stove, is not at the time a proper and competent watch. It is clearly the duty of the court to find that there was no proper lookout on the Fannie Hayden, and that the want of a lookout caused the collision. In coming to this conclusion we do not and need not go further than to consider the evidence of the captain and crew of the Fannie Hayden as to what happened on their vessel on the night of the collision.

Was the Lettie May at fault? The claimant contends that the Lettie May was in fault in that she was a vessel being overtaken by another, and that she should have shown a white or flare-up light to the Fannie Hayden as she was approaching. The court cannot come to this conclusion. The evidence in the case does not convince me that the vessel was being overtaken. The general course of the Fannie Hayden that night was a little south of east. The Lettie May was at the time hove to, and heading about northwest. There is not enough in the evidence as to the manner in which the vessels came together to induce the conclusion that the Fannie Hayden was approaching the Lettie May at least two points abaft the beam; but the whole testimony tends to the conclusion that the contrary is true.

The claimant insists further that the Lettie May did not have a red light on her port side at the time of the collision. On this point Miller, the cook, testifies that he filled, trimmed, and cleaned the lights the night before; that the supply of oil was ample; that he lighted the lights, and placed them on deck when the schooner got away. There was further testimony on the part of the crew that the lights were put in their proper places at the proper time. They were seen burning brightly after being put up, shortly before the collision. The testimony of Keating, master of the St. Paul, a schooner in the vicinity just before the collision, tends to show that the red light of the Lettie May was burning after she was

hove to. After the collision it is undoubtedly true that the red light was not burning, but the force of the impact of the colliding vessels was clearly sufficient to account for the putting out of the light. The most that can be said to the contrary is that a light might possibly have remained lighted in spite of the force of the collision. The green light did so remain. But it is not difficult to believe that a force which was sufficient to throw down the steps in the forecastle, to throw the covers from the stove and the dishes from the shelves, to put out the light in the forecastle, was also sufficient to put out the red light. The court is constrained to come to the conclusion that the port light was burning at the time of the collision.

But it is insisted on behalf of the claimant that there was an absence of a proper lookout on the part of the Lettie May. In considering this branch of the case we must give due weight to the fact that the Lettie May had the right of way at the time the two vessels came together. Whether she had a proper lookout or not, it was her duty to keep her course, and it was the duty of the Fannie Hayden to keep out of her way. I must hold, as was held in the case of The Fannie, 11 Wall. 243, 20 L. Ed. 114, that if the privileged schooner held her course it was all the burdened vessel had a right to require, and that, whether the privileged vessel had a proper lookout or not, it was her duty to do precisely what she did. It is true that the federal courts have repeatedly held that the burden rests on the ship to show, whenever it disregards any statutory regulations, not merely that such a disregard might not have been one of the causes of the collision, or that it probably was not, but that it could not have been. That rule does not apply in this case. We have not found that the Lettie May had violated or disregarded any statutory regulations. It is not material to inquire whether or not there was any incompetency on the part of the lookout at the time of the collision. We must come to the same conclusion in this regard as did Judge Putnam in the case of The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123, that, "where it appears that the vessel has only neglected the usual and proper measures of precaution, and has not violated any statutory regulations, the burden resting on her to show that the collision was not owing to her neglect, as the efficient cause, is only the ordinary one." In The Devonian (D. C.) 110 Fed. 588, Judge Lowell held that in the case before him the privileged vessel had a further duty upon her than merely keeping her course with her eyes shut; that a privileged vessel is to hold to her course, but must be constantly observing the burdened vessel, in order to notice if the latter fails in her duty. But this decision was based upon a peculiar state of facts. A schooner saw a steamer approaching, and knew that the steamer was large, and would have difficulty in maneuvering in the narrow passage into which it must shortly enter. Judge Lowell held that the schooner, knowing this, and considering her own slight maneuvering power, was under the duty not to lose sight of the steamer while tacking in narrow quarters. I cannot think that there is anything in

that case which should lead me to disregard the ordinary rule, announced in the case of The Fannie, supra, and followed in The Havana (D. C.) 54 Fed. 411. In The Columbian, 100 Fed. 991, 41 C. C. A. 150, the Circuit Court of Appeals for this circuit, Judge Putnam speaking for the court, held that the fact that a schooner had no one at the helm, which was lashed, or that she was insufficiently manned, cannot be held a fault contributing to a collision with a steamship in a fog at night, when in any event it would have been her duty to keep her course, and she did this. Judge Putnam says:

"Even if the schooner's helm had been free, and she had had a helmsman, and her deck had been manned to the satisfaction of the Columbian, nothing would have come therefrom, because the schooner would not have been justified in availing herself of all these things for the only purpose for which she could have availed herself of them under the circumstances; that is, making a change of course."

Judge Putnam further says:

"If the Ella M. Doughty [the privileged vessel] had changed her course, she would prima facie have violated the statutory rules, and under the decision of the Supreme Court she would have been required to show not merely that such violation was probably not one of the causes of the collision, but that it could not have been."

After giving regard to all the testimony in the case at bar, I am of the opinion that the Lettie May was not guilty of any fault which contributed to the collision. I find the collision was the fault of the Fannie Hayden.

A decree may be entered in favor of the libelants. A master may be appointed to assess damages.