The PURE OIL COMPANY et al.,
Appellants,

v.

UNION BARGE LINE CORPORATION
et al., Appellees.

No. 12422.

United States Court of Appeals
Sixth Circuit.

Dec. 2, 1955.

Edward B. Hayes, Chicago, Ill. (William B. Miller, Jr., William K. Johnson, Lord, Bissell & Brook, Chicago, Ill., Charles I. Dawson, Louisville, Ky., on the brief), for appellants.

Thomas J. Wood, T. Kennedy Helm, Jr., Louisville, Ky. (Stites, Wood, Helm & Peabody, Louisville, Ky., on the brief), for appellees.

Before SIMONS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

SHACKELFORD MILLER, Jr., Circuit Judge.

The appellant, The Pure Oil Company, owner of the Motor Vessel R. H. McElroy, filed this libel in rem and in personam against the tow boat Pennsylvania and its owner, the Union Barge Line Corporation, to recover damages in the amount of $7,642 arising out of a collision between the McElroy and the Pennsylvania on the Ohio River. The Union Barge Line Corporation filed an answer denying liability and a cross-libel against the McElroy and The Pure Oil Company for its damages in the amount of $24,566.82. The District Judge dismissed the libel and ordered that the cross-libelant recover the damages sustained by it, to be thereafter determined by hearings before a Commissioner. This appeal followed.

The evidence showed the following facts without material dispute, most of which were included in the findings of the District Judge.

The collision occurred in a heavy fog at about 3:20 a. m. on October 15, 1951, off the town of Point Pleasant, West Virginia. Point Pleasant lies on the left descending bank of the Ohio River, where the river is traversed by two parallel bridges extending from West Virginia to Ohio, located 528 feet apart. The channel span of the upstream bridge is 400 feet wide. The span of the lower bridge is 675 feet.

The McElroy was proceeding upstream, pushing a tow of four loaded barges, each 240 feet in length, made up two and two. The McElroy was 118 feet in length and 45 feet across her beam.

The Pennsylvania was bound downstream, pushing a tow of 20 barges, ten loaded and ten empties. The tow had a length of 935 feet, which with the length of the boat of 166 feet made an aggregate of 1101 feet.

The mouth of the Kanawha River is on the left descending bank of the Ohio approximately one-half mile below the lower bridge at Point Pleasant. Stone's Landing is two-tenths of a mile up the Kanawha from its mouth. The McElroy went into the Kanawha River to Stone's Landing to pick up a boiler barge. As it approached Stone's Landing it gave the usual landing signal of a long, two shorts, a long and a short. After attaching the barge to the fore part of

the tow on the starboard side the Mc-Elroy sounded the customary three long blasts of its whistle to indicate a backing-out movement, then backed out of the Kanawha into the Ohio and proceeded up-stream again.

It was necessary to turn the boiler barge end for end, or "top it around," which was done by two hands under the supervision of the mate with the aid of the searchlight on the pilot house of the McElroy. This work required that the tow move at no more than half or slow speed while it was being done. When the work was finished the head of the McElroy's tow was within about 100 yards of the lower bridge and the searchlight was turned off. The mate returned to the pilot house. The two deckhands also left the tow so that the McElroy was without any lookout at the head of her tow.

The McElroy had on the head of the tow a teletalk with an outlet in the pilot house, by means of which a lookout could communicate with the pilot. It was an electrically operated device which picked up, amplified, and transmitted to the pilot house, sounds at the head of the tow. It was a comparatively new instrument and was adjusted at the time for high volume. It could pick up sounds of wave wash of nearby vessels.

The pilot of the McElroy saw there was fog reaching the upper bridge before he turned off the searchlight. It seemed to him to be a solid bank at and above the bridge. It was moving down river fast but the navigation lights on the bridge spans were not obscured. He told the mate that the McElroy was going to tie up on account of fog as soon as she got through the bridges. He checked by radar a short distance below the bridges and did not see any indication of another vessel in it. Radar does not always show a vessel close to a bank or shore. As she came up to the bridges she was moving about three miles an hour.

As the head of the tow passed under the first bridge and just before going into the fog, the McElroy blew a fog signal of three short blasts. The mate testified that he heard no answering signal. When the head of her tow reached the fog bank its engines were increased to full speed ahead, so that, as explained by her pilot, he would have better steerage control and could get through the bridges before the fog shut out the channel lights on the bridges. Radar can not be safely used to navigate between bridge piers. When the stern of the McElroy had cleared the upper bridge the engines were stopped and placed in full reverse. The flotilla continued forward about 250 feet with its speed being eventually reduced to two or three miles per hour when it struck the head of the tow of the Pennsylvania.

The Pennsylvania, moving downstream in heavy fog, came on Motor Vessel Keeley also moving down-stream at Silver Run Light, 9½ miles above the Point Pleasant bridges. The Keeley had shut down her power meaning to tie up on the Ohio shore. The Captain of the Keeley blew the danger signal, talked to the pilot of the Pennsylvania on the radio telephone and arranged that the Pennsylvania should pass the Keeley on a 2-whistle signal on the Keeley's port, which arrangement was carried out. The Keeley went on in to the Ohio shore and tied up about 8 miles above the Point Pleasant bridges.

The Marietta Marine Ways is about a mile and three-tenths above the bridges. The Pennsylvania passed the Marietta Marine Ways about 45 minutes before the collision, running either slow-bell or floating and sounding fog whistles. At that time the pilot had his radar on the two-mile range. He heard the landing whistle of the McElroy at Stone's Landing, sounded an answering fog whistle, and saw her on radar as she entered the Kanawha River. He switched his radar to one mile range for the purpose of keeping his tow straight with the Ohio shore and did not see the McElroy when it backed out of the Kanawha River and started up-river again thirty minutes later.

After passing the Marietta Marine Ways it worked first one engine ahead, then stopped it and worked the other engine ahead so as to maintain the tow in a straight line with the Ohio shore, which would take it through the channel span of the railway bridge. The visibility was about two barge lengths. The mate of the Pennsylvania joined the lookout at the head of its tow. He saw a faint light which he recognized as the headlight of an approaching boat, which fact he communicated to the pilot. The pilot checked on the radar and saw an approaching tow close to the Ohio shore. He sounded the fog whistle and not receiving an acknowledgment he sounded the danger signal of four short distinct blasts. This was followed by two more fog signals. He started to blow a passing signal but the collision occurred before he could complete it. The pilot heard no answering signal until immediately prior to the impact when a signal was started to be blown from the oncoming boat. Before the collision the engines of the Pennsylvania were stopped. When the pilot sounded the first fog whistle he placed the engines astern and at the time of the collision they were running full astern, giving the Pennsylvania some sternway.

Both the libelant and the libelee charged the vessel of the other with fault and negligence in numerous respects, but on this appeal our attention is directed to specific rulings of the District Judge.

The District Judge ruled that the fault of the collision lay with the McElroy in failing to maintain a proper lookout, failing to give adequate signals as it proceeded into the fog bank, and in operating the flotilla at full speed under the dense fog conditions which prevailed. He rejected libelant's contention that the Pennsylvania was at fault. On this appeal libelant not only challenges the ruling that the McElroy was at fault, but also contends that the Pennsylvania was solely at fault because (1) she should have tied up at the Marietta Marine Ways or before, instead of continuing to navigate in blind fog; (2) she failed to keep a radar watch on the McElroy after learning of her presence in the Kanawha River; (3) that she failed to comply with the statutory requirement of blowing fog signals of at least one each minute; and (4) after knowing there was an approaching up-bound flotilla she failed to comply with the statutory rules for meeting and passing.

■ Although an appeal in admiralty has been called a trial de novo, it is now settled that findings of fact by the trial court will not be set aside unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6; United States v. Standard Oil Co., 6 Cir., 217 F.2d 539, 540; Benton v. United Towing Co., 9 Cir., 224 F.2d 558; Taylor v. Crain, 3 Cir., 224 F.2d 237, 238.

■ Well settled principles of Admiralty law impose the duty upon a vessel proceeding through fog to keep a proper lookout. The Ottawa, 3 Wall. 268, 273, 18 L.Ed. 165; The Ariadne, 13 Wall. 475, 478, 20 L.Ed. 542; The Choctaw, 6 Cir., 270 F. 114, 117–118. This duty is recognized by Rule 26 of the Navigation Rules for Rivers Emptying into the Gulf of Mexico and their Tributaries, 33 U.S.C.A. § 351, which provides —"Nothing in sections 302–352 of this title shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to *keep a proper look-out*, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." (Emphasis added.)

Appellant recognizes the general rule but contends that liability does not result from a failure to comply with the rule unless such failure was a cause of the accident. As expressed by the Supreme Court in The Fannie, 11 Wall. 238, 78 U.S. 238, 243, 20 L.Ed. 114, "We do not think it worthwhile to discuss the question whether the lookout

on the schooner was sufficient. If it was not, it can make no difference, for the want of a proper lookout did not contribute to the disaster." The Court repeated the rule in The Blue Jacket, 144 U.S. 371, 390, 12 S.Ct. 711, 718, 36 L.Ed. 469, wherein it said: "If the collision does not result as a consequence of neglecting to keep a proper lookout, the vessel is not thereby made responsible for the consequences of the collision; * * *." The appellant contends that since the evidence in this case showed without contradiction that visibility in the area of the collision was limited to about 75 or 100 feet and that a lookout in the bow of the McElroy's tow would not have been able to see the Pennsylvania in time to have avoided the collision, a lookout was useless. It further contends that while a human lookout is for the purpose of hearing as well as seeing, the teletalk in the bow of the McElroy was as good if not better for hearing purposes than a human being, in that it would pick up a sound as low as a whisper, amplify it and transmit it immediately to the pilot. It points out that the Pennsylvania was not coming ahead and was making no wave wash which a human lookout would have heard.

Although these contentions have some merit, we do not think that under the facts of this case the McElroy is excused from its failure to maintain the proper lookout as it proceeded up-river into the fog. In The Ariadne, supra, the Supreme Court said with reference to the duty of maintaining a proper lookout— "The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel with all the property and the lives of all on board. * * * In the performance of this duty the law requires indefatigable care and sleepless vigilance. * * * It is the duty of all courts, charged with the administration of this branch of our jurisprudence to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary." See also: The Tillicum, D.C., 217 F. 976, 978.

The evidence in this case does not conclusively show that a proper human lookout at the top of the McElroy's tow would not have been of assistance in avoiding the accident. The lookout on the Pennsylvania warned the pilot of the Pennsylvania of the McElroy's approach. A teletalk does not indicate from what direction sounds are coming, nor can it analyze them. Sounds relayed by the teletalk to the pilot house include all the sounds at the head of the tow, which after being received must be interpreted by the pilot who is engaged in navigating his vessel. As appellee's brief points out, the pilot of the McElroy was not only engaged in the operation of turning the boiler barge end for end after it came out of the Kanawha River, but was also observing the radar screen in addition to hearing and analyzing sounds transmitted by the teletalk. There was substantial evidence supporting the finding of the District Judge that there were numerous fog signals blown by the Pennsylvania before the collision. The pilot testified that he heard no signal from the Pennsylvania and did not know there was a flotilla up the river. Under the circumstances, we can not say that the McElroy's failure to have a lookout in the bow of its tow could not have contributed to the collision. The Choctaw, supra, 6 Cir., 270, F. 114; United States v. The Adrastus, 2 Cir., 190 F.2d 883, 886.

■■ Rule 16 of Navigation Rules for Rivers Emptying in the Gulf of Mexico and their Tributaries is in part as follows: "Every steam vessel shall, in fog, mist, falling snow, heavy rainstorms, or any other condition similarly restricting visibility, whether by day

or night, go at a moderate speed." Sec. 341, Title 33, U.S.C.A. What is "moderate speed" depends upon the circumstances of each case, but the purpose of the requirement being to guard against danger of collision, the speed should be reduced as the risk of meeting vessels is increased. The general rule in this country is to the effect that a steamer should use such precautions as will enable her to stop in time to avoid a collision after the approaching vessel comes in sight, provided such an approaching vessel herself is going at the moderate speed required by law. The Pennsylvania, 19 Wall. 125, 133, 22 L. Ed. 148; The Umbria, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053; The Chattahoochee, 173 U.S. 540, 548, 19 S.Ct. 491, 43 L.Ed. 801. The McElroy violated this rule in increasing its speed from about three miles per hour to full speed ahead when the head of her tow reached the fog bank, and continuing at that speed until she had cleared the upper bridge.

■ Appellant contends that the increased speed was justified under Rule 25, in order to have better steerage control and to get through the bridges before the fog shut out the channel lights. Rule 25 authorizes a departure from the usual rules under special circumstances in order to avoid immediate danger. Sec. 350, Title 33, U.S.C.A. We do not agree. The McElroy had theretofore been maintaining steerageway at its reduced speed. In any event, if a vessel can not maintain steerageway and at the same time keep her speed under control, she must come to anchor. The Pennsylvania, supra, 19 Wall. at page 134; The Southern Cross, 2 Cir., 93 F.2d 297, 299; The Silver Palm, 9 Cir., 94 F.2d 754, 758. The contention that it is the safer course for a vessel to run at full speed in a fog rather than at a slow speed in order to sooner pass the fog belt was early rejected by the Supreme Court in The Umbria, supra, where the Court said 166 U.S. on page 409, 17 S.Ct. on page 612 "* * * the custom is not one to which the courts can lend their sanction, as it implies a flagrant disregard of the safety of other vessels." The pilot of the McElroy knew of the presence of the fog bank before he entered it. If there was danger by reason of the fog shutting out the channel lights on the bridges, it was a danger he was not required to meet and did not constitute such a sudden emergency as to justify a departure from the rules. The H. F. Dimock, 1 Cir., 77 F. 226, 229.

■ We agree with the ruling of the District Judge that the McElroy was at fault.

With respect to the operation of the Pennsylvania, it was subject to the duties prescribed by Rule 15. Rule 15 provides that in fog or any other condition similarly restricted visibility "A steam vessel under way and towing another vessel or vessels shall sound, at intervals of not more than one minute, three distinct blasts of the whistle, of approximately equal length." Sec. 331(a), Title 33, U.S.C.A.

On this aspect of the case, the District Judge made findings of fact that above Point Pleasant, and again opposite the Marietta Marine Ways, the Pennsylvania blew fog signals which were noticed by employees of the Marietta Manufacturing Company; that Gene Juniper, who was waiting for the arrival of the Pennsylvania at Stone's Landing on the Kanawha, "heard numerous fog signals blown by the Pennsylvania before he heard the crash of the collision;" that the pilot of the Pennsylvania blew two fog signals as he was aligning his boat and tow with the signal lights on the upper bridge to pass through the draw; and that he had no response to any signal. This finding is supported by the evidence, is not clearly erroneous and is accepted on this review. However, such facts do not show a compliance with Rule 15. "Numerous fog signals" is too indefinite to enable us to construe it as including three distinct blasts of the whistle at intervals of not more than one minute over a period of

approximately 45 minutes, which was the running time of the Pennsylvania from opposite the Marietta Marine Ways to the point of the collision. A review of the evidence is accordingly necessary to determine whether the rule was complied with.

The pilot of the Pennsylvania testified that he blew the fog whistle passing the Marietta Manufacturing Plant and that between then and the sequence of whistles immediately prior to the collision he blew at least two fog whistles. After so testifying, he was again questioned as follows:

"Q. During that time, how many fog whistles did you blow? A. I blew at least two whistles from the time I passed the Marietta Ship Yards until the sequence of whistles. That is all I can recollect.

"Q. As a matter of fact, you won't be sure that it was more than one, will you? A. I will say at least two, but I can't recollect any more than that."

Gene Juniper testified that he was at Stone's Landing when the McElroy pulled out of the Kanawha River. His testimony on the point under consideration was as follows: "* * * after she backed out of Stone's Landing. Then we kept—we—me and my wife—kept hearing the Pennsylvania blowing whistles and then there was a bunch of them altogether, and then there was a crash, and my wife said 'they must have run into something' and the next morning we found out it was so." In our opinion, this evidence is insufficient to show compliance by the Pennsylvania with the statutory requirement. Appellee apparently concedes that the Pennsylvania did not comply scrupulously with the provisions of Rule 15. It contends, however, that the Pennsylvania in proceeding from the Marietta Marine Ways to the point of collision sounded numerous fog whistles which were adequate to notify the McElroy of her approach, had those in charge of the McElroy been paying attention.

■■ We recently had occasion in Eastern S. S. Co. v. International Harvester Company of N. J., 6 Cir., 189 F.2d 472, 476, to state and apply the law applicable to a vessel which is involved in a collision when it is in violation of a statutory rule of navigation. In such a case the burden rests upon such vessel of showing not merely that her fault might not have been one of the causes, but that such violation could not have contributed to the collision. The rule is well settled. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148; Pittsburgh S. S. Co. v. Duluth S. S. Co., 6 Cir., 222 F. 834, 835–836; Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 203 F.2d 264, 267; Puget Sound Navigation Co. v. Nelson, 9 Cir., 41 F.2d 356, 357. See: Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 298–299, 37 S.Ct. 270, 61 L.Ed. 726. In our opinion, the appellee did not meet this burden.

The District Judge did not make a specific finding of fact or ruling that the Pennsylvania was not at fault, but such a ruling was necessarily implied from the decree thereafter entered dismissing the libel against the Pennsylvania and directing that the cross-libelant recover from the McElroy and her claimant the damages sustained by it together with interest and costs. In this respect we are of the opinion that the District Judge was in error.

The judgment of the District Court is reversed and the cause is remanded with direction to hold both the McElroy and the Pennsylvania at fault, to take appropriate proceedings for the ascertainment of damages claimed by the respective parties, and to enter a decree for the equal division, with costs to be equally divided.