### THE INTERNATIONAL.

#### THE VENTURE.

(Circuit Court of Appeals, Third Circuit. January 30, 1906.)

#### No. 47.

COLLISION—YACHT AND TUG WITH TOW—YACHT DRIFTING IN RIVER CHANNEL.
A sloop yacht with a number of persons on board was making her way up the Delaware river at night with the flood tide. The wind was very light, and finally failed, leaving the yacht drifting without power of control from the western side of the river toward the center of the channel. No proper lookout was kept, but the master saw a tug and tow approaching from up the river when half a mile distant. Nothing was done to control the yacht until too late, and she continued to drift until she came into collision with one of the tows and was sunk. The tug also, which had three barges in tow abreast with a hawser and bridle, saw the yacht when half a mile distant almost directly ahead, but continued her speed and also her course, until she had passed a meeting vessel, when she changed to port, but did not at once signal the barges to do the same, and when she did later they were unable to clear the yacht. *Held*, that both vessels were in fault; the yacht for failure to keep a lookout and for not anchoring near the shore when the wind failed, but permitting herself to drift into the track of passing vessels, and the tug for not stopping, instead of trying to pass between the yacht and the meeting vessel with her tow, the danger being apparent, and also for not sooner signaling her tow to change course.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 125 Fed. 419.

John G. Lamb, for appellant.
Chester N. Farr, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the United States District Court for the Eastern district of Pennsylvania, in the cases named in the caption. 125 Fed. 419.

Benjamin D. Welch, as master of the yacht "Venture," filed his libel in the said district court, against the Philadelphia and Reading Railway Company, as owner of the steam tug, "International," in a cause civil and maritime, to recover damages resulting from a collision between the said yacht and certain barges, towed by the tug "International," on the Delaware river, on the night of July 14, 1900.

An answer was filed by the respondent, and also a petition for limitation of liability under the act of Congress, in that behalf, praying for an appraisement, and "that all claims by any persons whomsoever, for loss, damage or injury to persons or property caused by the said collision, shall be heard and determined in this court, and apportioned according to law." Petitions, as stated, were accordingly filed, for the purpose of recovering damages aforesaid. The learned district judge found both parties at fault, with the result that the damages were divided and a commissioner appointed to make inquiry and hear testimony as to what persons had suffered damage by reason of said collision, and the amount thereof. Upon the report of such commissioner, a final decree was entered by the court below, from which the present appeal has been taken. A careful reading of the testimony convinces us that the court below was right in the disposition made of this case, and that the opinion filed fully supports the conclusion arrived at by the learned judge. We therefore adopt the same as the opinion of this court, and quote it, as follows:

McPHERSON, District Judge. "By one of these libels, the sloop yacht 'Venture' seeks to recover damages for a collision by which she was sunk and became a total loss. The other proceeding was taken by the Railway Company, in order to limit its liability under the Act of Congress. I find the facts to be as follows:

"In the afternoon of July 14, 1900, the sloop yacht 'Venture,' a small pleasure craft, 42 feet long and 13 feet beam, started from Camden with a party of eighteen persons on board, both men and women, for a sail upon the Delaware river. They proceeded down the river, aided by the ebb tide, to a point not far below Lincoln Park, landing at the park about seven o'clock, because of the failure of the wind, with the purpose of waiting until a breeze should spring up, and also until the tide should turn. They remained at the park until about half past eleven o'clock, and then, as the tide was at the flood and a light breeze from the southwest was blowing, they started to return. The yacht was of light draft, drawing no more than 2 or 3 feet of water, and accordingly her master kept along the eastern shore of the river, in order to be out of the way of larger vessels proceeding up or down the river in the channel. Shortly after one o'clock the yacht reached League Island, where the river bends to the eastward and then resumes its northerly course, forming the Horseshoe Bend. Here they crossed the river to the western shore, and proceeded slowly along that shore as far as the upper end of the Ironside bar or shoal. At this point, the set of the tide, by reason of the bend, is toward the eastern or New Jersey shore; and here the very light breeze that had been helping them in some degree, left them entirely and the yacht merely drifted with the tide. Indeed, it had done little else than drift during their progress up the river, for the breeze had been barely sufficient to give the boat steerage way. The crew consisted of two

men, the captain and a mate. Both were in the stern of the boat, aft of the sail, which was swung over the starboard quarter. The captain was at the wheel, in such a position that he could not see up the river except by stooping and looking under the boom; and the mate was seated on the rail near the captain, in a little better situation, perhaps, to see approaching objects, but certainly not in the right place for a lookout under the circumstances. The night was clear and moonlight, and there was no difficulty in seeing lights of approaching vessels a long distance away. As the yacht drifted toward the center of the channel, the captain and the mate saw the lights of the tug 'International,' coming down the river with a tow. The tug is a powerful ocean-going vessel, 130 feet long, 26 feet beam, drawing 16 feet, and of 400 tons registered tonnage. The tow consisted of three large and heavy barges, loaded with coal, lashed together abreast, and attached by a bridle to a wire hawser about 60 fathoms long. The barges from starboard to port, were the 'Hercules,' 200 feet long and 27 feet beam, drawing 13½ feet of water and of 756 tons registered tonnage; the 'Girard,' 186 feet long, 35 feet beam, drawing 16 feet and of 841 tons registered tonnage; and the 'Glendower,' 193 feet long, 34 feet beam, 16 feet draught, 855 tons registered tonnage. When the tug was seen by the yacht, she was probably half a mile away, and each was showing her green light to the other. The yacht was headed somewhat toward the Pennsylvania shore, with her boom out to starboard and her sail set in order to catch an occasional puff from the south or west, but she was not under control, for the wind was not strong enough, or constant enough, to give her steerage way, and she was drifting with the tide toward the center of the channel and the track of other vessels. No effort was made on the part of the yacht to change this condition of affairs until the two boats had come very near to each other. There is some dispute concerning the distance that separated the tug and the yacht when they passed each other, but it makes little difference whether the distance was 30 feet, as one witness says, or 100 feet, as it seemed to another witness. In either event, the situation was plainly perilous, and the captain of the yacht, seeing that a collision was likely to occur with the tow, sent the mate forward with an oar to attempt to move the yacht to port, and an ineffectual effort in that direction was made. It was of no avail, however, and in a few moments the yacht came into collision with the barges and was sunk.

"From the point of view of the tug, the facts are these: The tug with its tow was coming down the river in the center of the channel, and as she approached the coal piers at Greenwich Point she saw down the river the red light of a tug having a schooner in tow, and the green light of the yacht. At this time, the 'International' and the yacht were at least a half mile distant from each other, the other tug being probably not much more than a quarter of a mile away. The situation was evidently dangerous. On the eastern side of the river was Greenwich Point anchorage, which was occupied that night by a number of vessels at anchor, and the available surface of the channel was thus reduced to a width of no more than 750 feet. Moreover, the yacht was then nearly in line with the tug, for the master of the tug testified that, when he first saw the yacht, after he had straightened down on a new course, she was 'just a little mite on the starboard bow.' The tug with the schooner in tow blew one whistle, indicating that she would pass to port, and this signal was returned by the 'International.' At this time, three possible courses were open to the 'International.' She could attempt to pass to the westward of the 'Venture,' where perhaps there may have been somewhat more room, but as this course required the tug to cross the bow of the yacht, and would have also involved the risk of collision, I think it was properly declined. Another course was to continue in the center of the channel and attempt to pass between the tug and tow, and the yacht. The third course was to come to a stop, or proceed with the utmost caution, until the dangerous passage should be safely accomplished. The master of the 'International' chose the second course, and without changing his direction or slackening speed determined to pass between the two ves-

sels. There is some conflict in the testimony concerning his manœuvres immediately before the collision took place, but I do not think the conflict is material. The evidence seems to me to establish clearly the fact, that after the schooner had passed the barges, the course of the 'International' was changed two or three points to port, in order to get as far as possible out of the way of the yacht, but by this time the current had carried the 'Venture' so far out into the channel that while the change was sufficient to carry the tug clear, it was not possible then to pull the tow out of the way. This might, perhaps, have been done if the course of the tow had also been altered at the time when the change was made by the tug, but no signal to this effect was given to the barges until an appreciable time after her own course was altered, and there was, therefore, a distinct, and what may have been a material, delay in this attempt at co-operation. The result was. that the unwieldy tow kept its course without sensible change, the mast of the yacht was caught by the bridle of the tow, and the yacht slipped along the bridle until she struck the stem of the 'Hercules,' and then swung around into the space between the 'Hercules' and the 'Girard' where she was overturned and sank. All on board were rescued, except one woman, who was drowned, for whose death damages are claimed by her parents, but the survivors all suffered some loss of property, for which also compensation is claimed in the present proceeding.

"Upon these facts, it is clear to my mind, that both vessels were at fault. The 'Venture' had no business to be in the channel, in the way of large ships proceeding up or down the river, while she was drifting helplessly with the tide and could not be directed. The wind failed while she was still close to the Pennsylvania shore, and the anchor should then have been dropped, unless the captain found it possible so to direct the boat that she would not move further out. He knew that the tide was carrying him out to the middle of the stream, and if he could not steer the boat near the shore, it was plain negligence, as it seems to me, to allow her to drift out to the middle of the river,· where a collision at any time might be inevitable. The John S. Smith (D. C.) 27 Fed. 398; The Media (D. C.) 45 Fed. 79. It was negligence, also, not to keep a proper lookout. Possibly, an earlier discovery of the approaching tug might not have availed, but this is not certain, and, unless it be clear that the absence of a proper lookout did not contribute to the collision, such absence is a fault. The 'International,' also, was negligent, in my opinion, in not stopping at a safe distance from the approaching vessels, or in not slowing down and proceeding with the utmost caution. The Jesse Knight (D. C.) 45 Fed. 590; The Havana (D. C.) 54 Fed. 411; The Medusa (D. C.) 46 Fed. 303. The situation clearly was one of great danger. Only a narrow lane was offered her for passage, and she had behind her a tow more than a hundred feet broad; enough to occupy nearly one-seventh of the whole breadth of the available channel. Certainly, under such circumstances, to go on without slackening speed was to take an unjustifiable risk, and I have no doubt at all, that this failure to act with the proper caution contributed materially to the accident. She did slow down and stop briefly after she came abreast of the yacht, but it was then too late. It was a fault, also, not to signal the barges more promptly to change their course to port. The master of the tug admitted delay in the signal, excusing it on the ground that, 'I did not think it was necessary, and it is not customary unless there is imminent danger.' To my mind, the danger was imminent enough to require the promptest action, and to omit to call for such help as the barges might be able to afford, little as it might be, was negligence.

"I find, therefore, that both parties were at fault, with the result that the damages must be divided. There is not enough testimony in the record to enable me to determine in every case how much damage has been suffered, and the inquiry upon this point must, therefore, go to a commissioner, who is directed to hear such further testimony as may be offered, and to report a suitable decree."

The decree of the court below is hereby affirmed.