## The Eider.

## New York, L. E. & W. R. Co. *v.* The Eider.

(*District Court, D. New Jersey.* February 16, 1889.)

1. **Collision—Between Steam-Ship and Ferry-Boat—Speed and Course of Steam-Ship.**

   An ocean steamer proceeded up the North river on an ebb-tide and in daylight at a speed of at least 8 to 10 miles an hour, until not more than 300 feet from a ferry-boat, which was then 5 points off its starboard bow, and was beginning to cross its course at about the same speed. The ferry-boat suddenly checked its speed. and, there then being no time to change the steam-ship's helm, the vessels collided. *Held*, that the steam-ship, whose officers knew that the ferry-boat was about to cross its course, was in fault for maintaining its course and speed until it was unable to meet the emergency.

2. **Same—Lookout on Ferry-Boat.**

   The ferry-boat was struck abaft the wheel-house, from the rearward. The upper part of the pilot-house was protected by sliding windows, having a solid door on the after-port side, and one of the wheelmen, who had an unobstructed view ahead and on each side, did not see what had struck the ferry-boat until the door was opened. *Held*, that the absence of a lookout forward did not contribute to the collision, and was not a fault.

3. **Same—Checking Speed of Ferry-Boat—Overtaking Vessel.**

   The ferry-boat checked its speed because of a tug and tow, 500 or 600 feet ahead, passing between the ferry-boat and its slip. None of the officers of the ferry-boat saw the steam-ship before the collision. *Held*, that as the ferry-boat might have maintained its speed and course for 200 or 300 feet more with no risk, and by doing so would have cleared the steam-ship, it was in fault in checking its speed in the absence of an emergency without due consideration of the movements of a following vessel.

In Admiralty.

Libel for damages from a collision by the New York, Lake Erie & Western Railroad Company against the steamship Eider, the North German Lloyd Steam-Ship Company, claimant.

*Wilcox, Adams & Macklin*, for libelant.

*Shipman, Barlow, Larocque & Choate*, for claimant.

WALES, J. This suit has been brought to recover damages caused by a collision between the libelant's ferry-boat, Pavonia, and the claimant's steam-ship, Eider, which occurred in the North river, on the 25th of January, 1888. The Pavonia had left her slip at the foot of Chambers street, New York, at 15 minutes past 9 o'clock A. M., for the Pavonia ferry, about one mile distant on the opposite shore, and bearing northwest. The Pavonia's course was straight out to the middle of and then up the river for some distance, until she gradually sheered towards her slip on the opposite side. The weather was clear and cold, with a light wind from the north, and the tide running ebb. At this stage of the tide, she generally made the distance between the two ferries in 8 minutes; and on this occasion, and just before the collision, she was going at the rate of 8 or 10 miles an hour. She had reached a point within 700 to 1,000 feet of the New Jersey shore, and from 400 to 700 feet south of

the Pavonia ferry, when her engine was stopped, and her speed slackened, to allow a tug with a mud-scow in tow to pass across the mouth of the slip. The Pavonia's headway was not entirely stopped, and she was still forging ahead, and angling up the river, when her engine was again started at full speed, but had not made more than one revolution before the Eider, which was going up the river, struck her on the port side, abaft the wheel-house, and about 75 feet from her stern, cutting through her guard planking and deck, and slightly indenting her hull. No person on board the Pavonia saw the Eider before the collision, or heard any signal of her approaching.

The Eider, a large ocean steam-ship, 450 feet in length, and of 2,953 net tonnage, had left her anchorage, at Staten Island, at 8:25 A. M., and, after passing the Battery, headed straight up the river, at the distance of 700 feet from the New Jersey shore, for her dock at Hoboken, which is one mile above the Pavonia ferry. Pilot Jackson, who was in charge of the Eider, was shaping her course in such a direction as to "split the tide," because in that position she was more easily handled. He saw the Pavonia leave Chambers street when the Eider was some distance below, and had her in full view while she was going ahead and up the river, and knew that she was bound for her slip on the opposite side. Both vessels appear to have kept their respective courses, without any change of speed, until they were not more than 300 feet apart, with the Pavonia still leading, and five points off the starboard bow of the Eider, and beginning to cross the course of the latter. At this juncture, Jackson says that he stopped and reversed the Eider, to let the Pavonia pass; and that the latter, a few seconds later, suddenly stopped her engine, and reduced her speed so much that the tide brought her down against the stem of the Eider, which was then at a stand-still, or going astern. Neither Jackson nor Capt. Baur, of the steam-ship, saw the tug and tow passing up the river between the Pavonia and her slip. The libelant charges the Eider with the fault of the collision because she did not pass under the stern, or otherwise keep out of the way of the Pavonia, which, it is alleged she could have done by stopping and reversing sooner than she did, or by putting her helm hard a-port in time, and thus changing her course; and that the neglect to do either was aggravated by the Eider keeping too near the shore, and going at too great speed under conditions which demanded the utmost caution. It is not denied that it was the duty of the Eider to keep out of the way of the Pavonia under articles 16 and 20 of the revised international regulations, (23 U. S. St. 441, 442;) but the claimant insists that the precautions taken by the Eider in the performance of that duty were thwarted by the sudden and unexpected checking of the Pavonia's speed, thus leaving the latter at the mercy of the tide, which carried her down against the Eider.

As is usual in these cases, there is much conflict of testimony in relation to speed, distances, and time of giving orders; making it difficult to ascertain all the facts with reasonable certainty. The captain and the pilot of the Eider differ materially in fixing the time when the or-

ders were given to stop and reverse the steam-ship. The captain says that these orders were not given until 10 or 15 seconds after the Pavonia's speed had been checked. His statement is:

"I saw the ferry-boat coming on, and apparently crossing our bow, until her bearings were about a point and a half on the starboard, but still going ahead a little. I couldn't explain it to myself, but about ten or fifteen seconds after she stopped, I ordered my engine to be stopped to half speed and full speed back, and told the officer to blow the whistle three times."

There was then no time to change the Eider's helm, and the vessels collided 25 seconds afterwards. It is evident from this that the captain of the Eider did not intend to stop her until he saw that the Pavonia had slackened her speed; for he goes on to say, in effect, that had both vessels continued on their respective courses without change of speed, the Eider would have passed 50 feet astern of the Pavonia. The testimony of the pilot is that when the Pavonia was 300 feet distant, and four points off the Eider's starboard bow, and about going across at full speed, the order was given to stop and reverse the Eider; and that the Pavonia would have crossed without trouble, if she had not slackened her speed. His opinion is that if both vessels had kept on without change of course or speed by either, the ferry-boat might have struck the Eider amid-ships. There is some further discrepancy between these two witnesses as to the rate of speed of the Eider before she stopped and reversed her engine; but on this question the testimony of witnesses outside of the Eider, and the distances covered by each vessel prior to the collision, furnish more satisfactory evidence. The Eider had made the distance between her anchorage and the place of collision—eight and a half miles—in less than 55 minutes, including two stoppages, while going up the river, for passing boats. According to her pilot, she was going slow all the way up; but her speed may also be measured by the fact that when he first sighted the Pavonia the latter had rather a shorter distance to cover before the courses of the two vessels would cross than the Eider; and that consequently the Eider must have been running at a speed equal to, if not in excess of, the Pavonia's. It is questionable whether keeping up such speed by the Eider, while so near the shore, was either safe or prudent. The rule laid down by the admiralty courts of the Southern and Eastern districts of New York, in which collisions on the water are of frequent occurrence, is that these large steamers should occupy as nearly as possible the middle of the river, and proceed with such speed as to be easily stopped. *The Favorita*, 8 Blatchf. 539; *The Columbia*, 8 Fed. Rep. 716; *The Monticello*, 15 Fed. Rep. 474; *The Hackensack*, 32 Fed. Rep. 800; *The E. H. Webster*, 22 Fed. Rep. 171. Although, in the cases just cited, the defaulting vessels were much nearer to the shore than the Eider is proved to have been, the latter would have diminished the risk of collision if she had kept further out in the river. Be this as it may, the speed of the Eider was excessive, and those who were in charge of her should not have approached so near to the Pavonia, when they knew that the latter would soon cross the Eider's course, and that a sufficient distance must be kept between

the two vessels to enable them to go clear of each other. It was inconvenient for the Eider to change her helm, and her fault was in maintaining her course and speed until she was unable to stop and back, or change her course, in time to successfully meet an emergency which daily occurs in the crowded waters around the city of New York.

But it is objected that the Pavonia was in fault in not having a competent lookout, properly stationed, who could have seen the Eider, and given notice of her proximity; also that the Pavonia should have maintained her speed, and not slackened it just as she was crossing the Eider's bow. The relative positions of the vessels, when the Pavonia slackened her speed, were such that if there had been a lookout forward he could not have seen the Eider without turning half around and looking over his shoulder. The two men who were at the wheel of the Pavonia had an unobstructed view ahead, and on each side, and they did not see the Eider until the moment of collision. The photograph of the port side of the Pavonia, and the diagram of her deck plan, show that the Eider struck the Pavonia at less than a right angle, which would have been more acute except for the facts that, in reversing, the Eider's stem was turned to the starboard, and that her first impact with the Pavonia pushed the latter's stern up the river. The upper part of the pilot-house of the Pavonia is protected by sliding windows, having a solid door on the after-port side; and Capt. Higgins, who was one of the men at the wheel, says that he did not see what had struck the Pavonia until this door was opened immediately after the collision. Under these circumstances it is plain that the absence of a lookout on the forward part of the Pavonia did not contribute to the collision; and whenever this clearly appears, the obligatory rule of navigation which requires a special lookout does not apply. The Farragut, 10 Wall. 334.

The conduct of the Pavonia in suddenly altering her speed, if there was no urgent necessity for her to do it, cannot be so readily excused; for it is evident from the proof that this action just as she began to cross the Eider's bow contributed to the collision; and it follows that unless the reduction of speed under the circumstances was justifiable, or made to escape impending danger, she cannot be exempted from blame. Capt. Wilson, one of the libelant's witnesses, who was coming down the river on the ferry-boat, Passaic, and saw the Pavonia and Eider just before the collision, places the Eider more than 900 feet from the shore, and says the Pavonia was still further out. He also testifies that it is the duty of the officers of a ferry-boat which is about to enter her slip to look out for any vessels that may be going up or down the river, and that the Pavonia's pilots could and ought to have seen the Eider. The tug and tow, which were passing in front of the slip, were 500 or 600 feet from the Pavonia, and not near enough to compel the latter to stop at the moment she did. There was sufficient room ahead and to the starboard of the Pavonia to have allowed her to keep up her speed for 200 or 300 feet more, and by so doing she would have easily cleared the Eider without incurring the smallest risk of running into the tug. The Pavonia was the privileged vessel, and entitled to the right of way, both as leading

and being on the starboard bow of the Eider; but it was none the less her duty to keep her course and speed, and not to interfere with the action of the Eider, which was endeavoring to leave room for her passage, and would probably have succeeded had the Pavonia not changed her speed. It was incumbent on the Pavonia, under article 22 of the regulations, to hold her course; and, failing to do this, she committed an error. The rules of navigation imply that an overtaken vessel shall hold her course and maintain her speed. *The Britannia*, 34 Fed. Rep. 552. The officers of the Pavonia should have been more vigilant in observing whether any other vessel was coming up astern, or on her quarter, before stopping her engine. While the law does not require a special lookout to be stationed aft, it will not excuse the want of ordinary prudence on the part of those whose business it is to determine whether they can change the course or speed of their own vessel without improperly embarrassing the movements of a following one. There was no imminent peril confronting the Pavonia demanding instant action, and excusing an error of judgment. The accident happened in broad daylight, and the remarkable fact that no one on the Pavonia saw the Eider, until after the collision, can only be accounted for on the supposition that the officers and crew of the ferry-boat had sought shelter from the intense cold, and were looking in only one direction. From the whole evidence, it would seem that each vessel was consulting its own convenience, without due consideration of the movements of the other; and, as both were in fault, the damages must be divided.