---

## The ANNA W.

### (District Court, E. D. New York. August 22, 1910.)

1. COLLISION (§ 77*)—FAULT—ABSENCE OF LOOKOUT.

    The absence of a lookout on a vessel stationed where he should he will not render such vessel in fault for a collision, where she was navigated exactly as she should have been had there been a lookout reporting the situation.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*]

2. COLLISION (§ 61*)—TUG AND TOW MEETING SCHOONER—NEGLIGENCE OF TUG.

    A collision between a schooner passing up the Main Ship Channel into lower New York Bay, at night, before the wind, but against an ebb tide at a speed of not more than 1½ knots and the tow of a meeting tug on a hawser 1,200 feet long, *held* due solely to the fault of the tug in failing to keep further toward the west side of the channel in view of her duty as the burdened vessel to keep out of the way and the length of her hawser, which by the set of the tide would cause her tow to sag to the eastward of her own course.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*

    Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

**3.** COLLISION (§ 114*)—LIABILITY TO CARGO OWNER.

  The owner of the cargo of a vessel sunk in collision which occurred through the sole fault of the other vessel is entitled to recover his damages against the vessel so in fault.

  [Ed. Note.—For other cases, see Collision, Cent. Dig. § 243; Dec. Dig. § 114.*]

In Admiralty. Suits by Jared Griffing, as owner of the schooner Daylight, and by the President and Directors of the Insurance Company of North America, against the steamtug Anna W. Decrees for libelants.

Garvan & Armstrong, for libelant Griffing.

Kneeland & Harison (Lawrence Kneeland, of counsel), for libelant Insurance Company of North America.

Carpenter & Park, for The Anna W.

CHATFIELD, District Judge. The libelant is the master of the three-masted schooner Daylight, which, on a voyage up the Atlantic Coast, entered New York Harbor, on the night of January 17, 1910. The sky was not clear, but, as all of the witnesses testified, lights could be plainly seen for a considerable distance. Between 4 and 5 o'clock in the morning, a breeze was blowing from the south, registering at Sandy Hook 9 knots an hour, but in this locality its strength was not sufficient to propel the loaded schooner against the tide at more than 1 or 1½ knots up the bay. At the point in question, which is in the neighborhood of the West Bank Light, just north of the junction of the Swash Channel with the Main Channel to the Lower Bay, the tide at the hour in question was running ebb, and setting with considerable strength to the southeast or toward the Ambrose Channel.

Under these conditions, the schooner, with her sails to starboard, was running before the wind on a course, as fixed by her captain, N. by E., which would be substantially up the channel. The lookout of the schooner was either below after a cup of coffee, or was just changing, and took no part in the proceedings. The captain was acting as lookout, from a point by the wheel; but his vision dead ahead was not as unobstructed as would have been that of the lookout, who should have been in the bow.

After leaving the Swash Channel, the schooner sighted a tow of one barge, upon a hawser 200 fathoms in length, drawn by the Anna W. This tow was seen coming down the channel shortly before 5 o'clock in the morning, at a distance of some two miles. The captain and others observed the course of the tow, straight down the channel, during all of that period, and claim to have seen both side lights of the tug. Another tow, with the tug Dubois, was slightly to the rear and to the westward of the Anna W., and the testimony of the captain of the Dubois throws considerable light upon the situation.

As the boats neared one another, the testimony indicates that the Anna W. was following a compass course approximately S. by W. ½ W.; the channel at that point being nearly S. by W. ¼ W. The tow,

---

as a whole, proceeded straight down the channel; the inclination of the tug toward the west offsetting the drift of the tide to the east, and was making some 8 knots over the ground.

The position of the various boats indicates that the Anna W. was about in the center of the channel, while her scow was further over toward the eastward, and that the Daylight was coming up just on the eastern side of midchannel. After the accident she floated well over toward the Ambrose Channel, before sinking; her position then being exactly indicated by the wreckers who raised her from where she lay. The strength and set of the tide was also observed by these wreckers in such a way as to verify the conditions above described, and the relative positions and movements of the boats are quite definitely established.

The captain of the schooner, upon reaching a point some 200 yards from the tug, observed what he thought was a turn to starboard and a shutting out of the tug's green light. As the schooner was substantially in the path of the tow at that time, it would seem that this change in the light was caused by the close approach of the tug upon its course across the tide, and not because of any substantial change of helm. But the captain of the schooner then assumed, from his observations at this point, that the tug was intending to pass the schooner to port, and he accordingly put his own helm to port so as to bear away from the tug. At this time he also noticed the three lights upon the mast of the tug, indicating a tow, and went forward to see if he could see where the tow lay. He failed to discover the lights of the tow, although the evidence showed that they were burning and in their ordinary positions. This failure to ascertain the lights of the tow may have been due to either of two causes. He may have confused the lights of the Dubois and its tow with those for which he was seeking, or he may have failed to notice the scow off to the east of the path of the tug, and hence in a direction substantially close under his bows, and where he could not locate them as readily without going to the extreme bow of his own vessel.

The effect of the ported helm carried the schooner off somewhat to the east, but not enough to bring her around to a position where her sails would jibe, or beyond a generally northeasterly course. The captain of the schooner testifies that she did not have steerage way sufficient to move more rapidly from the path of the tow, and that they passed the tug not more than 20 feet away; the crew of the tug estimating the distance between the boats at the point of passing as 100 feet. But, however that may be, it was an extremely short distance, and it would seem that the schooner did not have way enough to throw the bow around to the eastward sufficiently to avoid collision. But the schooner did work somewhat toward the east, and thus came in contact on her port bow with the forward port corner of the barge, breaking the hawser of the tow at a point near the scow, by the strain of collision.

The tug was headed S. by W. ½ W. and moving on a course S. by W. ¼ W. The schooner was headed N. by E. or N. ½ E., and proceeding N. by E. ¼ E. They were therefore moving on exactly paral-

lel courses. When approaching closely the tug would show her red light to the schooner's green light, for a time, and then, if they passed port to port, 100 feet apart, with the tow following in the path of the tug, the schooner could never have collided with the scow. But much more impossible would have been collision when the schooner fell off two points in going about 300 feet further; that is, if her bow moved a corresponding amount more to the eastward. The pilot of the tug claims that the schooner showed him her red light all the time, and that the schooner must have luffed in order to strike the scow. But the other testimony indicates nothing of the sort.

In this situation a difference of a few feet would have caused the vessels to clear; and it must be held that the captain and lookout of the schooner should have known where the scow was throughout the entire period. But the schooner had the right of way, and the presence of the lookout could not have made any difference in what the captain did after the tow crossed the schooner's bow. The captain did as he should in ordering the helm hard aport, and hence the failure to have a lookout to notify the captain that a tow was following should not be of itself considered actionable. The Farragut, 77 U. S. 334, 19 L. Ed. 946; The Pilot Boy, 115 Fed. 873, 53 C. C. A. 329; The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711, 36 L. Ed. 469; The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519.

Under the conditions of wind and tide, the captain should have appreciated the position of the scow, in a tow coming straight down the channel for the distance covered while he was watching the tow; but a lookout on the bow of the boat might have been able to locate the scow and might have reported it before the captain found the tug would pass to port, and put his helm hard aport accordingly.

But that is pure speculation, and the burden was on the tug to so navigate as to clear the tow when holding her course and using reasonable care to avoid obvious danger. The absence of the lookout was not the proximate cause of the collision, and it is not clear proof of negligence, unless coupled with a failure to appreciate the true situation on the part of the captain of the schooner. He assumed that it was the duty of the tug to keep itself and its tow out of the way of the sailing vessel, and that therefore he was called upon to do nothing more than to indicate his own position to the tow, and to hold his course. Such would ordinarily be the rule. The Isaac H. Tillyer (D. C.) 101 Fed. 478; The Mary A. Bird (D. C.) 102 Fed. 648; The Fannie, 11 Wall. 238, 20 L. Ed. 114.

In the particular circumstances of this case, and when sailing without a lookout, the captain was bound to realize that ordinary conditions and dangerous situations could not be ignored by him, to the extent of failing to do what was proper to avoid collision, when a tow was crossing his course, when danger was imminent and when he had had full opportunity to realize, or by careful observation to ascertain, the exact necessities of the situation. But this apparently he did do. He did what he should have done if the lookout had reported the scow, and we must look to the action of the burdened vessel to see why it did not keep its tow clear.

The towboat was proceeding with a hawser 1,200 feet long. This, while not of itself forbidden at the time, was, under the conditions of wind and tide, a dangerous menace in that portion of the channel. A reference to the chart will show that upon the course indicated a hawser 1,200 feet long would sag diagonally over a considerable portion of the channel. The captain of the tugboat testified that he did not haul his boat further to the west and attempt to get out of the way of the schooner, for the reason that this would have taken him out of his course and into danger from the banks on the western side of the channel. He made no effort to do more than he did do, for the reason that he thought the tow would clear, and he would seem to have been negligent in both respects. With a hawser of this length, the burden being upon the steam vessel to keep out of the way of a sailing vessel, when the sailing vessel was fulfilling the duties required of her (The Fannie, supra, and The Isaac H. Tillyer, supra), the captain of the towboat should have so maneuvered that the length of the hawser would not of itself endanger the sailing vessel. Again, observing the condition of wind and the tide, the speed of the schooner, and the amount of steerageway at the time of passing, the captain of the towboat should have better estimated the ability of the schooner to protect herself, and also, realizing that the burden was upon him, keep out of the schooner's way; he should not have taken the chance which he did in anticipating that the schooner could clear his scow without further effort on his own part. The speed of the tow was much greater than that of the schooner, and, if the tug had stopped, the schooner could have cleared the scow, in all probability, even allowing for the drift of the tide. It is evident that, if the schooner had known what the tug was going to do, the accident might not have happened. If the tugboat had not committed acts of negligence on its part, the accident would not have happened. But the two transactions are so commingled, and the captain of the schooner did so exactly what he would have done if a lookout had been present, that the plain acts of negligence on the part of the tug must be held responsible for the result.

The president and directors of the Insurance Company of North America, suing as cargo claimants, have alleged faults on the part of the tugboat similar to those charged by the Daylight, and should recover therefor against the tugboat. The Atlas, 93 U. S. 302, 23 L. Ed. 863, and Erie R. R. Co. v. Erie Trans. Co., 204 U. S. 220, 27 Sup. Ct. 246, 51 L. Ed. 450. Even if any fault had been found on the part of the Daylight, it would not be actionable by the owners of the cargo, under the Harter act. The Chattahooche, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801; Erie R. R. v. Erie Trans. Co., supra.

But the tugboat having been held at fault, the cargo libelants are entitled to hold her for their damage.