## THE GREYSTOKE CASTLE.

### (District Court, N. D. California. September 14, 1912.)

1. COLLISION (§ 94*)—OVERTAKING VESSEL—NEGLECT TO KEEP LOOKOUT.

A steamship which overtook and ran down a tug, which was preceding her in San Francisco Bay for the purpose of docking her at the city, *held* solely in fault for not keeping out of the way as required by the rules, and for not keeping a lookout forward; it appearing from the evidence that the tug maintained her course and speed as was her duty.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. § 94.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. COLLISION (§ 105*)—FAULT—EVIDENCE.

Where one vessel was guilty of a clear violation of the rules sufficient to account for a collision, she cannot escape liability by raising a mere doubt as to the conduct of the other vessel.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 105.*]

8. COLLISION (§ 52*)—OVERTAKING VESSELS—DUTY OF OVERTAKEN VESSEL.

An overtaken vessel is under no duty to keep a lookout aft to prevent being run down by the overtaking vessel, but has a right to act on the presumption that the latter will keep out of her way.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 62; Dec. Dig. § 52.*

Collision with overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

In Admiralty. Suit by the Shipowners' & Merchants' Tugboat Company, owner of the tug Sea Prince, against the steamship Greystoke Castle. Decree for libelant.

Ira A. Campbell, of San Francisco, Cal., for libelant.

Nathan H. Frank, of San Francisco, Cal., for respondent.

BEAN, District Judge. This is a case of a collision. It occurred in San Francisco Bay between the steamship Greystoke Castle and the tug Sea Prince about 5 o'clock in the afternoon of November 18, 1910. The tug had been employed by the steamship to undock her at Port Costa and redock her at the city. After the steamer had been undocked at Port Costa, the two vessels proceeded down the river and bay, each on its own power. The tug was in advance. The steamer had no outlook forward, and the officer on the bridge could not see the water within 200 or 300 feet of her stem. When they arrived off the lower end of Angel Island, the tug was run into and sunk by the steamer, and all her crew except the captain drowned. The owners of the tug, claiming that the Greystoke Castle was at fault, because she did not have a proper lookout and because she failed to keep a safe distance from the tug, in violation of the rules of navigation requiring her to keep out of the way of the tug, brought this proceeding to recover the damages caused thereby. The claimant maintains that there was no fault on the part of the steamship, but that the tug reversed just as she was entering the strong tide running to starboard, suddenly throwing the tug under the bow of the steamer, and thus causing the collision.

[1] At the hearing I was impressed with the view that the steamer was at fault, and a careful re-examination of the record and the briefs of counsel confirm me in that opinion. There is an irreconcilable conflict in the testimony as to the speed and movement of the two vessels after they left Port Costa and up to the time of the collision. The master of the Greystoke Castle says that he did not make to exceed 8 knots, and the captain of the tug testifies that his speed was from 9 to 9½ knots, and that it was not reduced. Manifestly both of these statements cannot be true. It would be an impossibility for a vessel making no more than 8 knots an hour to overtake and run down a vessel ahead going at the rate of 9 or 9½ knots an hour, as long as both boats kept their speed. If, therefore, the case had to

be determined from the testimony of interested parties alone, its solution would be difficult. However, it does not depend on the absolute speed of the two vessels, nor the testimony of their officers. There were eyewitnesses to the collision and the movement of the vessels prior thereto, who are wholly disinterested, and whose testimony I think unmistakably fixes the fault. At the time the Greystoke Castle and the Sea Prince were approaching the upper end of Angel Island, the Monticello swung out from the Immigration Wharf on her regular voyage to San Francisco. The captain of the Monticello testifies that at that time the tug was about 400 feet ahead of the steamer; that the Monticello came in on the starboard side of the two vessels, and ran on a course parallel and about 200 or 300 feet distant from them until the collision; that when off Point Simpton the Monticello was abreast of the Greystoke Castle, and was ahead of her about 150 feet when they reached Quarry Point; that at that time the tug was about 150 or 200 feet ahead of the Greystoke Castle; that the Greystoke Castle commenced to crawl up on the tug, and continued to do so until the moment of the collision; that he observed their positions particularly, because he was watching the General Frisbie, which was on the port side; that—

"I commenced to watch them more after leaving Quarry Point, because the Frisbie is on the same run as we are. I had a lot of Chinese on board that day, with their baggage, which we had to get off. It was low water, and we had all the baggage down on the lower deck of the Monticello. If the Frisbie beat me in, I should have to take the low deck, and I thought we might be able to beat her in, and I thought I would watch the Frisbie to see where she was, because she was on the other side of the Greystoke Castle. I happened to be watching and see when she got across the bow of the Greystoke Castle, to see what position she was in. * * * I was on the port side of the Monticello"

—and was watching the Greystoke Castle and the tug all the time. That at the time of the collision—

"the big steamer seemed to lift the small one on her quarter, and shove her around his bow about 15 feet, and turn her clear over. Her fore foot shot out of the water, and her stern went under just like that (illustrating). She went right over. I never see nothing of her stern after the big boat hit her and forced her down. Her fore foot shot out of the water just like a porpoise. Just as it happened I stopped and commenced backing." The tug did not "seem to lose any more speed than she had previous to that, and I had been watching the speed. * * * She was going about the same speed I noticed right along. I was watching on the opposite side. I was watching for the Frisbie. She was going on the Oakland side, and did not seem to be losing any. She had the same bone in her mouth that she had previously."

Now, no one had a better opportunity of seeing and observing the movement of the vessels and all that occurred at the time of the collision than this witness, and his testimony, I think, is entitled to great weight. Moreover, he is corroborated by Gardner, Kennah, Trumbly, and Harrington, who were passengers aboard the Monticello, and who were observing the movements of the Greystoke Castle and the tug from the time they passed the upper end of Angel Island to the collision. So I take it to be clearly established that during that time that Greystoke Castle was continually crawling up on the tug. She was therefore the overtaking vessel and obligated to keep out of the

way. Article 24, Inland Rules. The burden of proof is upon her to show that the collision was caused by no fault on her part, but by some fault or neglect of duty on the part of the tug. The Governor, Fed. Cas. No. 5,645; The Sif (D. C.) 181 Fed. 412; The Cephalonia (D. C.) 29 Fed. 332. And this I think she has wholly failed to do. It was the duty of the tug to keep her course and speed, and she was not at fault for doing so. The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771.

It is insisted by the respondent that the tug changed her course and speed, so as to bring her suddenly under the bow of the Greystoke Castle and thus caused the collision; but this defense is not sustained by the evidence. The captain of the tug testified that he was maintaining the same course and speed at the time of the collision that he had been going for some considerable time prior thereto, and had not veered therefrom nor slackened the same; and he is corroborated, as we have seen, by the testimony of the captain of the Monticello and the passengers aboard that vessel. An attempt is made to discredit the testimony of the eyewitnesses by inferences or conclusions sought to be drawn from the condition of the engines of the tug when she was raised. At that time her throttle was found wide open and clamped, the steam was shut off from the reversing engine, the reversing lever was a little beyond the center and slightly clamped, the links were in full reverse position, and the hawser was in the wheel. It is argued that this shows that the engine must have been reversed before the collision and under the bow of the steamer.

[2] Different theories were advanced by experts to account for these facts, and much testimony was given by the respective parties in reference thereto; but at the most it only suggests a doubt as to the conduct of the tug, and that is not sufficient to relieve the Greystoke Castle from liability. The tug was a privileged vessel. It was her duty to keep her course and speed, and it was the duty of the Greystoke Castle to keep out of her way and not run her down. She was closely following the tug, with no lookout, and apparently without taking any precaution to ascertain the position of the tug or her distance. She was therefore guilty of a clear violation of the rules of navigation sufficient to account for the collision, and cannot escape liability by raising a mere doubt as to the conduct of the tug. Doubts should be resolved in favor of the tug and against the Greystoke Castle. The Pocomoke (D. C.) 150 Fed. 193.

[3] The claim is made that the tug was at fault because her crew were not at their stations at the time of the collision. The bodies of three of the crew of five were found in the messroom when the tug was raised, and there was evidence that just a short time before the collision some one was seen by one of the passengers of the Monticello to go from the engine room to the stern of the tug and return. But this was not a fault contributing to the collision. The tug had a right to assume that the burdened vessel would discharge her duty, and to make her course and keep her speed on that assumption. The Britania, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660; The Free State, 91 U. S. 200, 23 L. Ed.

299; The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771; Hutchinson v. The Northfield, 154 U. S. 629, App'x, 14 Sup. Ct. 1184, 24 L. Ed. 680. It was not her duty to keep a lookout aft to prevent being run down by the steamer, so long as she performed her duty in holding her course and speed. The Fannie, 11 Wall. 238, 20 L. Ed. 114; The Eider (D. C.) 37 Fed. 903; The Havana (D. C.) 54 Fed. 411; The Anna W. (D. C.) 181 Fed. 604; The Fannie Hayden (D. C.) 137 Fed. 280.

Again, it is claimed that at the time of the collision the tug had just passed into a tide rip caused by the opposing and cross-currents of the river and Oakland tide, and that her speed was thereby retarded, while the steamer was still under the influence of the down current, and thus the collision is accounted for, without the fault of the Greystoke Castle. The evidence does not support this theory. The captain of the tug testified that his boat was not affected either in her course or speed by the tide rip, and the captain of the Monticello says that both vessels had passed through and were out of the effect of the tide rip at the time of the collision. I can find no satisfactory evidence that the tide rip materially affected either the speed or course of the vessel.

Upon the whole testimony I am clearly of the opinion that the collision was caused by the fault of the Greystoke Castle and she is liable for the damages arising therefrom. The usual order of reference will be made.